# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 6, 2024 Decided August 2, 2024

No. 23-5159

MATTHEW D. GREEN, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01492)

---

*Benjamin D. Margo* argued the cause for appellants. On the briefs were *Corynne McSherry*, *Mitchell L. Stoltz*, *Brian M. Willen*, and *Lauren Gallo White*.

*John W. Crittenden* was on the brief for *amicus curiae* Legal Scholars in support of appellants.

*Charles Duan* was on the brief for *amici curiae* Public Knowledge, et al. in support of appellants.

*Jack I. Lerner* was on the brief for *amicus curiae* Kartemquin Educational Films and International Documentary Association in support of appellants.

*Vivek Krishnamurthy* was on the brief for *amicus curiae* Accessibility, Archival, and Security Fair Users in support of appellants.

*Brian J. Springer*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Daniel Tenny*, Attorney.

*John Matthew DeWeese Williams* and *Lucy Holmes Plovnick* were on the brief for *amici curiae* Association of American Publishers, Inc., et al. in support of appellees.

*David Jonathan Taylor* was on the brief for *amici curiae* DVD Copy Control Association, Inc. and Advanced Access Content System Licensing Administrator, LLC in support of appellees.

Before: HENDERSON, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Twenty-six years ago, Congress enacted the Digital Millenium Copyright Act to protect copyrighted works made available online from digital piracy and unauthorized access. Plaintiffs-Appellants, a computer science professor and a tech inventor, say the Act is so plainly unconstitutional that it cannot be applied to anyone. They challenge the law's prohibitions against circumvention of technological protections on copyrighted works and distribution of the means to circumvent. In their view, those provisions violate the First Amendment's free speech protections by unduly stifling the fair use of copyrighted works.

Having abandoned their as-applied challenges, plaintiffs seek outright invalidation of a central pillar of the Act as overbroad and a prior restraint on speech in violation of the First Amendment. We reject both facial challenges.

**I.**

**A.**

The First Amendment and Copyright Clause appear, at first glance, to be in tension. The First Amendment guarantees freedom of speech, *see* U.S. Const. amend. I, but the Copyright Clause, by "securing for limited Times to Authors . . . the exclusive right to their respective writings . . . ," *id.* art. I, § 8, cl. 8, has the "inherent and intended effect" of restricting some expression by others, *Golan v. Holder*, 565 U.S. 302, 327-28 (2012). The tension is more apparent than real, however, insofar as the Copyright Clause bolsters the First Amendment by acting as an "engine of free expression." *Id.* at 328 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985)). By creating a "marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Id.* (quoting *Harper & Row*, 471 U.S. at 558). Consistent with the Copyright Clause, the First Amendment "securely protects the freedom to make—or decline to make—one's own speech," but it "bears less heavily when speakers assert the right to make other people's speeches." *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003). The purpose of Copyright law to "promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8—in other words, to "*promote* the creation and publication of free expression," *Eldred*, 537 U.S. at 219—generally accords with the First Amendment's aims.

That said, to avoid impeding robust expression, courts have long recognized a common-law doctrine of "fair use" that

implies an "author's consent to a reasonable use of his copyrighted works" by other speakers. *Harper & Row*, 471 U.S. at 549 (quoting Horace G. Ball, Law of Copyright and Literary Property 260 (1944)). Fair use has historically limited copyright owners' exclusive rights in order to facilitate certain uses of information by nonowners. In the Copyright Act of 1976, which gave copyright holders "a bundle of exclusive rights" to their copyrighted work, Congress codified fair use as an affirmative defense to a claim of copyright infringement. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526-27 (2023) (quoting *Harper & Row*, 471 U.S. at 546). The fair use doctrine permits the use of copyrighted work "for purposes such as criticism, comment, news reporting, teaching, . . . scholarship, or research," 17 U.S.C. § 107, and enables "courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster," *Andy Warhol Found.*, 598 U.S. at 527 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

Faced with First Amendment challenges to statutes that regulate copyright, the Supreme Court has described fair use as one of two "traditional First Amendment safeguards" designed to strike a balance in copyright law. *Eldred*, 537 U.S. at 220. The other referenced safeguard is copyright's distinction between uncopyrightable ideas and copyrightable expression, codified at 17 U.S.C. § 102(b). That distinction ensures that "every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation" even though particular means of expressing it do not. *Eldred*, 537 U.S. at 219. Copyright laws are not categorically invulnerable to First Amendment challenge, but where "Congress has not altered the traditional contours of copyright protection"—as where it aptly respects the idea/expression dichotomy and fair use—the Supreme Court has opined that "further First Amendment

scrutiny is unnecessary." *Id.* at 221. Thus, fair use is a "built-in First Amendment accommodation[]" in copyright law—endowing fair use with some constitutional pedigree. *Id.* at 219.

In acknowledging that the fair use defense serves constitutional values, we do not mean to suggest that Congress lacks freedom to alter the contours of that defense. To the contrary, the Supreme Court has consistently acknowledged Congress's power to "take a fresh look" should it disagree with judicial application of fair use doctrine. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984). And Congress has in fact done so at various points throughout the nation's history. For instance, while Justice Story once recognized abridgment as one type of non-infringing fair use, *Folsom v. Marsh*, 9 F. Cas. 342, 344-45 (C.C.D. Mass. 1841), Congress later extended copyright's protection to exclusive abridgement rights, *see* Copyright Act of 1909 § 1(b), Pub. L. 60–349, 35 Stat. 1075 (1909); *see also* Paul Goldstein, *Derivative Rights and Derivative Works in Copyright*, 30 J. Copyright Soc'y U.S.A. 209, 214 (1982).

Fair use plays a key role in striking a balance between expression and prohibition in copyright law. But because the line between uses that are fair and those that are infringing eludes crisp definition, creators relying on fair use as a defense against claims of copyright infringement inevitably face some uncertainty. Courts determine case by case whether use of a copyrighted work constitutes fair use, sometimes based on subsidiary factual determinations made by juries. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 23-26 (2021). Indeed, the Supreme Court has described reliance on a "potential fair use defense" as a "roll [of] the dice," subjecting the user of copyrighted material to a "notoriously fact sensitive" analysis

that typically cannot be resolved "without a trial." *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020).

That uncertainty risks chilling some privileged speech, but it inheres in the contextual character of the fair use defense. The Copyright Act directs courts determining whether a work constitutes fair use to consider a non-exhaustive list of factors, including:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. When those factors favor a finding of fair use, that use is "not an infringement of copyright." 17 U.S.C. § 107.

**B.**

With the rise of streaming services and electronic readers, the public enjoys unprecedented access to copyrighted materials. Billions of people worldwide can stream copyrighted TV shows into their homes, listen to copyrighted music through the smartphones in their pockets, or instantaneously download copyrighted novels onto an e-reader. In the 1990s, Congress anticipated that "the movies, music, software, and literary works that are the fruit of American

creative genius" could soon be accessed "quickly and conveniently via the Internet." S. Rep. No. 105-190, at 8 (1998). Spurred by that accurate forecast and obligated to implement two World Intellectual Property Organization treaties, Congress erected new legal guardrails to facilitate those advances. After all, "without reasonable assurance that they will be protected against massive piracy," copyright owners could hardly be expected to make their works readily available on the internet or in digital form. *Id.*

Enter the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 1201 *et. seq*. The Act "backed with legal sanctions" copyright owners' use of "digital walls" to protect their copyrighted works from piracy. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 458 (2007) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)). Those walls, also called technological protection measures, limit access to and use of copyrighted work. For example, many subscription-based video or music streaming services protect their copyrighted TV shows, movies, and music from unauthorized access by requiring users to subscribe and log in, and by encrypting the accessed media to prevent unauthorized copying. As technology has become omnipresent in modern life, an increasing number of consumer devices—including smartphones, automobiles, insulin pumps, and smart home appliances—contain copyrighted software shielded by technological protection measures to prevent consumers from accessing and manipulating it. *See* U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights, at 88 (June 2017), https://perma.cc/D7EK-KAEJ. The DMCA protects all those technological locks through two main provisions at issue in this appeal.

The first provision is the Act's anticircumvention provision, which forbids "circumvent[ing] a technological

measure that effectively controls access to a work protected" by copyright law. 17 U.S.C. § 1201(a)(1)(A). It prohibits individuals from overcoming technological access controls on copyrighted material, including by "descrambl[ing] a scrambled work" or "decrypt[ing] an encrypted work" absent "the authority of the copyright owner." *Id.* § 1201(a)(3)(A). Congress noted that "the conduct of circumvention was never before made unlawful," S. Rep. 105-190, at 12, but explained the need for the new protection as akin to "making it illegal to break into a house using a tool, the primary purpose of which is to break into houses," *id.* at 11. In other words, the anticircumvention provision is designed to operate as a prohibition against digital trespass.

The anticircumvention provision is subject to statutory and regulatory exemptions. Section 1201 itself provides some exemptions. For example, nonprofit libraries may overcome technological controls to gain access to copyrighted work if they do so "solely in order to make a good faith determination of whether to acquire a copy of th[e] work" that is otherwise not reasonably available. 17 U.S.C. § 1201(d). Other exemptions apply to law enforcement and governmental activities, encryption research, security testing, and circumvention done for the sole purpose of preventing collection of a user's personally identifying information. *Id.* § 1201(e), (g)-(j).

Congress also created a rulemaking process to more dynamically exempt categories of circumvention activity from the DCMA. Under 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress conducts a triennial rulemaking proceeding to grant exemptions to people who are or are likely to be "adversely affected" by the anticircumvention provision in their ability to make noninfringing uses of copyrighted materials. In deciding whether to propose exemptions, the Librarian of Congress acts

on the recommendation of the Register of Copyrights, who must consult with the Assistant Secretary for Communications and Information of the Department of Commerce. *See id.*

The culmination of each triennial rulemaking cycle is a final rule that exempts identified types of uses of copyrighted work from the anticircumvention provision. For example, in the most recent final rule issued in 2021, the Librarian exempted certain researchers' use of "literary works . . . distributed electronically" insofar as their use is "solely to deploy text and data mining techniques on a corpus of literary works for the purpose of scholarly research and teaching." Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies (2021 Final Rule), 86 Fed. Reg. 59,627, 59,639/1 (Oct. 28, 2021) (codified at 37 C.F.R. § 201.40(b)(5)). Specific uses of motion pictures are also exempted, including "in order to make use of short portions of the motion pictures . . . for the purpose of criticism or comment . . . for use in documentary filmmaking" or where a film of any type makes use of the clip for parody or for its biographical or historical significance. *Id.* at 59,637/3 (codified at 37 C.F.R. § 201.40(b)(1)).

Congress envisioned this rulemaking process as a "fail-safe" to ensure that the anticircumvention provision leaves breathing room for noninfringing uses, including fair use, of copyrighted content. *See* H.R. Rep. No. 105-551, pt. 2, at 36 (1998). Indeed, the triennial rulemaking scheme was Congress's response to concerns widely voiced during the drafting of the DMCA that, if not carefully crafted, it might "create a 'pay-per-use' society" without adequate protection for noninfringing expression. *Id.* at 26; *see also* David Nimmer, *A Riff on Fair Use in the Digital Millenium Copyright Act*, 148 U. Penn. L. Rev. 673, 716-26 (2000) (explaining the emergence of this "fail-safe" after legislative backlash to an

earlier draft of the DMCA that did not include explicit protections for fair use). If the Act entitled owners of information to "lock up" all access—as it might in a fully digitized environment—would-be fair users of information could be relegated to negotiating access on terms set by the monopoly rights-holders. Nimmer, *supra*, at 717-19. The Act's drafters sought to avoid such threat to fair uses by balancing the right against circumvention with access protections for certain non-infringing uses.

The second provision of Section 1201 at issue in this appeal—the antitrafficking provision—is not subject to the triennial rulemaking cycle's exemptions. That provision is, in effect, a ban on trafficking in digital lock picks. It prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, [or] component" that: (1) is "primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted] work," (2) "has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a [copyrighted] work," or (3) is "marketed . . . for use in circumventing a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(2)(A)-(C). This provision has been used, for example, to prevent hackers from publicly circulating a computer program that breaks the encryption controlling unauthorized access to or copying of DVDs. *See Universal City Studios*, 273 F.3d at 435-36, 459-60.

Section 1201(c) clarifies that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). The DMCA thus leaves fair use

undiminished as a defense against copyright liability. Defenses against liability under the DMCA deploy fair use concepts, but do not directly incorporate copyright law's fair use standards. Plaintiffs' challenge depends on that gap: They claim that a substantial amount of what the DMCA prohibits as circumvention or trafficking facilitates expression that copyright law privileges as fair use.

**C.**

Plaintiff Matthew Green, a computer science professor at Johns Hopkins University, conducts research on security flaws in widely used electronic systems and notifies manufacturers of his findings. For example, he previously identified security flaws in automotive anti-theft systems, website encryption, and Apple's iMessage system. Although section 1201(j) provides an exemption for certain forms of "security testing," Green believed that exemption was "both overly narrow and vague," Compl. ¶ 79 (J.A. 30). So Green requested in the 2015 rulemaking cycle a broader exemption from the Librarian of Congress to cover his research. But the 2015 final rule's security research exemption was, in Green's view, likewise too narrowly drawn.

Because he could not rely on the statutory or regulatory exemptions, Green claimed, his fear of liability under section 1201(a) caused him to "decline to investigate certain devices," "chilled [him] from informing others of vulnerabilities," and "prevent[ed] Green from selling a book that might garner significant commercial sales discussing how to circumvent access controls." *Id.* ¶¶ 80-87 (J.A. 30-31). Green claimed that both his circumvention of access controls to conduct security research and his publication of information about his work are protected by the First Amendment, and that the DMCA is thus unconstitutional as applied to those planned activities.

Plaintiffs Andrew "bunnie" Huang and his audiovisual media company, Alphamax (collectively, Huang), also alleged that section 1201(a) chills their constitutionally protected expression. Huang seeks to create and commercially sell a device he calls "NeTVCR," which would allow users to save, manipulate, convert, and edit high-definition digital video streams. *Id.* ¶¶ 89-91 (J.A. 32). Those video streams—like shows on Netflix, for example—are generally protected by a technology called High-bandwidth Digital Content Protection (HDCP), which prevents unauthorized copying or capturing of copyrighted content by people lawfully streaming it on their devices. The NeTVCR device operates by circumventing that protection technology.

Huang claimed that his NeTVCR device would permit users to "engage in new forms of protected and noninfringing expression." *Id.* ¶ 100 (J.A. 34). He identified hypothetical expressive uses of the device such as using "a single TV screen [to] display a live presidential debate and the text of a commentator's live blog," creating a "side-by-side comparison between two films . . . for media literacy education," or using a "single TV screen that simultaneously displays the coverage of a live event by more than one news source." *Id.* ¶ 100 (J.A. 34). Like Green, Huang unsuccessfully sought exemptions from the Library of Congress. *Id.* ¶¶ 107-08 (J.A. 35). Without those exemptions, Huang alleged, he is unconstitutionally deterred by section 1201(a) from using or distributing the NeTVCR device.

The plaintiffs sued to invalidate section 1201, urging that the anticircumvention and antitrafficking provisions are facially overbroad and that the Librarian of Congress's triennial rulemaking process is an invalid speech-licensing regime—all in violation of the First Amendment. *Id.* ¶¶ 111-28 (J.A. 36-38). They also brought as-applied challenges to the

anticircumvention and antitrafficking provisions, contending that those prohibitions unconstitutionally burden their specific expressive activities. *Id.* ¶¶ 129-49 (J.A. 38-41). And they argued that the Librarian of Congress's denial of their requested exemptions in the 2015 rulemaking cycle violated the First Amendment and Administrative Procedure Act. *Id.* ¶¶ 150-62 (J.A. 41-42).

The government moved to dismiss the complaint and plaintiffs cross-moved for a preliminary injunction. The district court stayed the preliminary injunction motion pending its decision on the motion to dismiss. The court later granted in part and denied in part the government's motion to dismiss, dismissing plaintiffs' facial First Amendment challenges and APA claims, but denying the motion to dismiss as to their as-applied claims. *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 85-100 (D.D.C. 2019).

The court dismissed the facial overbreadth challenge on the basis of plaintiffs' failure to allege that the DMCA would "'have any different impact on third parties' interests in free speech than it has on' their own." *Id.* at 88 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984)). And it rejected plaintiffs' contention that the triennial rulemaking constituted a prior restraint, holding that it did not effect any content-based censorship. *Id.* at 89-90. The court concluded that plaintiffs failed to allege "facts indicating that the rulemaking defendants' decision of whether to grant exemptions in the 2015 rulemaking process was based on the content of what those who sought exemptions wanted to say, their viewpoint, or who they are." *Id.* at 90. The court also dismissed plaintiffs' APA claims, holding that the triennial rulemaking process is not subject to the APA. *Id.* at 96-100. (We later rejected that proposition in *Medical Imaging &*

*Technology Alliance v. Library of Congress*, 103 F.4th 830, 836 (D.C. Cir. 2024)).

But the district court denied the government's motion to dismiss plaintiffs' as-applied First Amendment claims. The court held that the government failed to meet its burden to show that section 1201(a) does not encumber substantially more of plaintiffs' speech than necessary to further its interest—the test required under intermediate scrutiny. *Green*, 392 F. Supp. 3d at 94-95.

Plaintiffs then renewed their motion for a preliminary injunction on their as-applied claims, which the district court denied. *Green v. U.S. Dep't of Justice*, No. 16-1492, 2021 WL 11637039 (D.D.C. July 15, 2021). By this time, the Librarian of Congress in the 2018 rulemaking cycle had granted Green's request for an exemption allowing him to circumvent in furtherance of his security research, so he no longer pressed his as-applied challenge to the anticircumvention prohibition. And the court concluded that sale of Green's academic book would not run afoul of the antitrafficking provision because it fell outside of the definition of banned trafficking products as those with "only limited commercially significant purpose or use other than to circumvent" or that are marketed for the purpose of circumvention. 17 U.S.C. § 1201(a)(2). With that provision inapplicable to Green's book, he was not likely to succeed on the merits of his as-applied claim against the antitrafficking provision. *Green*, 2021 WL 1167039, at *5-6.

As to Huang, assuming without deciding that his proposed use and sale of his circumvention device counted as speech, the district court held that the government satisfied its burden under intermediate scrutiny to justify application of section 1201(a)'s anticircumvention and antitrafficking provisions to his proposed conduct. *Id.* at *7-10. The court noted that

Huang's technology, as described, would "eviscerate virtually every single video content delivery protection system," and thus would expose anything displayable on a modern TV screen or laptop to widespread piracy. *Id.* at *8. The court accordingly held that, as applied to Huang, Section 1201(a) does not burden substantially more speech than necessary.

We affirmed the district court's denial of preliminary injunctive relief in *Green v. U.S. Dep't of Justice*, 54 F.4th 738 (D.C. Cir. 2022). We declined on that appeal to exercise jurisdiction over the court's earlier dismissal of the facial claims because the court had not entered judgment on plaintiffs' still pending as-applied claims, so the order granting in part the government's motion to dismiss was not yet final and appealable under 28 U.S.C. § 1291. Only the denial of the preliminary injunction on the as-applied claims was appealable on an interlocutory basis under 28 U.S.C. § 1292(a)(1). *Green*, 54 F.4th at 743-44. We affirmed as to Green on the ground that he failed to establish a substantial likelihood of standing because the publication and sale of his book would not violate the antitrafficking provision. *Id.* at 744. And we held that Huang's as-applied claim was not likely to succeed on the merits. The anticircumvention and antitrafficking provisions "target not the expressive content of computer code, but rather the act of circumvention and the provision of circumvention-enabling tools," so they are subject to intermediate scrutiny—a test we held they "easily survive[]." *Id.* at 745-46.

On remand, plaintiffs voluntarily dismissed their as-applied claims. Once the district court entered final judgment, plaintiffs appealed the district court's earlier order dismissing their facial First Amendment challenges to section 1201(a) for failure to state legally viable claims under Federal Rule of Civil Procedure 12(b)(6). Those facial challenges are now before us

on *de novo* review. *See, e.g.*, *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).

**II.**

At the core of plaintiffs' challenge to section 1201(a) of the DMCA is its asserted incongruence with the fair use exception to copyright infringement liability. An individual who circumvents technological protection measures on a copyrighted work to make fair use of the work is immunized by the fair use defense from liability for infringing the copyright. But, unless an anticircumvention exemption applies, her conduct may nonetheless violate the DMCA's anticircumvention provision. What good is the fair use defense, the plaintiffs ask, if the DMCA prohibits them from accessing the copyrighted works in the first place?

Consider a filmmaker making a fictionalized drama about emergency responders to the September 11th attacks who wants to stage a scene in which the responders' families watch real-life footage of the immediate aftermath of the attacks on a television set. If use of copyrighted footage for that purpose constitutes fair use, the filmmaker would not be liable for infringement. *See, e.g.*, *Fioranelli v. CBS Broadcasting Inc.*, 551 F. Supp. 3d 199, 240-41 (S.D.N.Y. 2021). But if the filmmaker circumvented technological controls in order to obtain the footage, the court's fair use determination would not shield against liability under the DCMA, unless her use of the clip fell within one of the anticircumvention provision's statutory or regulatory exemptions. (As it happens, the use would likely qualify under the 2021 Final Rule's exemption permitting circumvention to use clips for their "historically significant nature," 86 Fed. Reg. at 59,637/3 (codified at 37 C.F.R. § 201.40(b)(1)), but at the time of plaintiffs' complaint, that exemption only accommodated circumvention by

documentary filmmakers using those clips—not creators of fictional films.) In other words, some individuals who seek to make fair use of copyrighted work may find themselves stymied, not by copyright infringement laws, but by the DMCA's prohibition on circumventing technological controls in order to freely obtain high-quality and manipulable versions of clips of copyrighted works.

In plaintiffs' view, a mismatch in protection for fair use under traditional copyright law and under the DMCA renders the latter unconstitutional. They assert that all fair use is protected by the First Amendment, so section 1201(a) cannot validly prohibit circumvention by individuals for the purpose of making fair use of copyrighted works. And they argue that Congress's explicit attempt to build fair-use accommodations into section 1201(a) via the triennial rulemaking process merely compounded the First Amendment injury: In its effort to alleviate the Act's burden on fair users, plaintiffs contend, Congress transformed the Librarian of Congress into a censor who wields broad discretion to grant exemptions to favored messages and speakers.

Key to plaintiffs' theory is their view that fair use of copyrighted work is necessarily protected by the First Amendment. We later explain why that assumption is erroneous, but it is worth considering at the outset what it would mean for plaintiffs' theory if true.

If plaintiffs were right that would-be speakers have a blanket First Amendment right to circumvent in the service of uses that would be fair under copyright law, the triennial rulemaking's exemption scheme would be essentially redundant: With or without a regulatory exemption, fair users could circumvent technological protections of copyrighted

works and claim a First Amendment defense to liability under the DMCA.

An irony of appellants' challenge to the DMCA is that the triennial rulemaking exemption scheme—which identifies in advance and immunizes categories of likely fair uses—may be less chilling of the fair uses to which it applies than the after-the-fact operation of the fair use defense itself. Recall that the Supreme Court has referred to the use of copyrighted materials under the protection of a "potential fair use defense" as a "roll [of] the dice." *Public.Resource.Org.*, 590 U.S. at 275. The 9/11 drama's creator, for example, may not be able to anticipate with certitude that her use of archival footage would be noninfringing, given that fair use turns on a "notoriously fact sensitive" analysis. *Id.* A decision to include the archival footage carries legal risk. In contrast, by promulgating general rules in advance, the anticircumvention exemption scheme gives the filmmaker clearer notice of the legality of specific forms of circumvention, thus reducing the chill of legal uncertainty under the DMCA relative to the chill inherent in copyright law's fair use doctrine.

More fundamentally, if appellants were correct that the First Amendment protected circumvention undertaken for fair use ends, then section 1201(a)'s regulatory exemptions would simply serve as an additional layer of protection for fair users, providing up-front confirmation to those fair users who fall within the scope of the exemptions that their circumvention is permitted. What is more, even as to actions not covered by a DMCA statutory or regulatory exemption, under plaintiffs' view, the filmmaker would have a First Amendment right to circumvent: She would be free to take her chances by circumventing and proving that her use of the clip is fair use and thus constitutionally protected. So it is hard to see how,

under plaintiffs' view of the law, section 1201(a) operates to chill speech.

But we disagree that the First Amendment necessarily shields all fair uses of copyrighted work from regulation, and, regardless, Congress's objective to promote rather than chill speech is no guarantee that its enactment survives a First Amendment challenge. We accordingly proceed to address why, under each doctrinal framework plaintiffs deploy, their facial challenges fail. First, we explain that plaintiffs have not satisfied the overbreadth doctrine's exacting requirement to demonstrate unconstitutional applications of section 1201(a) that are substantially disproportionate to its lawful sweep. Second, we explain why the anticircumvention provision's regulatory exemption scheme is not an unconstitutional prior restraint on speech.

**A.**

Plaintiffs contend that section 1201(a) "burden[s]" expressive conduct that "consists substantially of noninfringing speech that the First Amendment protects," rendering the section facially overbroad. Appellants' Br. 47; *see* Reply Br. 3-9. They emphasize that the anticircumvention provision prevents non-parties such as some filmmakers and teachers from accessing high-quality versions of copyrighted works to engage in speech that would qualify as fair use—speech that plaintiffs argue cannot be burdened without running afoul of the First Amendment. Because plaintiffs assert that section 1201(a)'s "applications to protected speech outweigh its legitimate sweep," they contend the law's anticircumvention and antitrafficking provisions are wholly invalid. Reply Br. 24.

Facial invalidation of a statute for overbreadth is disfavored. It "is 'strong medicine' that is not to be 'casually

employed.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). Only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," will a law fail for overbreadth. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 n.6 (2008)). The unconstitutional applications must be "realistic, not fanciful," and "substantially disproportionate" to the statute's lawful applications. *Hansen*, 599 U.S. at 770. Unless the ratio between a statute's unlawful applications and its lawful ones is so "lopsided" as to support an overbreadth challenge, "courts must handle unconstitutional applications as they usually do"—in as-applied challenges. *Hansen*, 599 U.S. at 770. Accordingly, facial overbreadth challenges are by design "hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).

Plaintiffs' facial overbreadth challenge is especially disfavored because section 1201(a) expressly regulates conduct—the circumvention of technological locks, and trafficking in means of circumvention—rather than speech. The DMCA defines circumvention as the act of "descrambl[ing] a scrambled work, . . . decrypt[ing] an encrypted work, or otherwise . . . avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure." 17 U.S.C. § 1201(a)(3)(A). The act of circumvention is not inherently expressive because it does not "'inten[d] to convey a particularized message' in a manner that allows others to understand it." *Price v. Garland*, 45 F.4th 1059, 1076 (D.C. Cir. 2022) (Henderson, J., concurring) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)). The act of trafficking in circumvention technology is likewise not inherently expressive. As the government aptly notes, trafficking is no more identified with expression than is the sale

of lock picks for breaking into bookstores identified with the expressive conduct of reading the stores' books. Gov't Br. 24. The overbreadth doctrine is an awkward tool with which to attack the DCMA, because "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

The plainly legitimate sweep of section 1201(a) is extensive. Indeed, a large swath of conduct prohibited by the statute is not even arguably related to expression. The DMCA applies to circumvention, and the act of selling the technology to enable circumvention, of digital controls on the software embedded in a range of consumer goods, including automobiles, smart appliances, and medical devices. Plaintiffs note that some owners of those devices might seek to modify, repair, or analyze information in the devices, requiring the circumvention of technological protections. But regardless of whether the act of bypassing those technological controls ultimately facilitates fair or noninfringing uses, those uses are themselves entirely non-expressive and unprotected by the First Amendment. In itself, repairing a smart alarm clock is not expressive conduct—so circumventing access controls on its embedded software to do so is unprotected by the First Amendment.[1]

---

[1] The Federal Circuit has held that the DMCA's anticircumvention and antitrafficking provisions only prohibit acts with "a reasonable relationship between the circumvention at issue and a use relating to a property right for which the Copyright Act permits the copyright owner to withhold authorization." *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1204 (Fed. Cir. 2004). In other words, the court narrowly interpreted section 1201(a) to include a required nexus with copyright

The "heartland" conduct the anticircumvention and antitrafficking provisions criminalize is piracy of digital property—a modern form of theft. *Hansen*, 599 U.S. at 782; *see, e.g.*, *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (affirming DMCA trafficking sentence based on sales of counterfeit "access cards" enabling nonsubscribers to watch satellite television); *United States v. Silvius*, 559 F. App'x 490 (6th Cir. 2014) (affirming DMCA trafficking conviction based on sales of microchips to enable users to bypass video game consoles' digital locks against pirated video games). Even where the theft is in aid of constitutionally protected conduct, such as watching a movie or reading a book, the DMCA's anticircumvention provision may apply consistently with the First Amendment. *See* Oral Arg. Rec. 12:15-13:10 (plaintiffs' counsel conceding that "it is permissible under the First Amendment to prohibit" such theft).

Many legitimate applications of the challenged provisions are undisputed by the plaintiffs. The government notes and plaintiffs do not contest that the anticircumvention provision bars individuals from hacking into a music streaming service to access its catalogue for free. Gov't Br. 21-22. Similarly, the provision forbids overriding the time restriction on a digital movie rental to have permanent access to it. And the antitrafficking provision "prevents the distribution of tools that would enable the sort of circumvention discussed above on a

---

infringement, thus excluding fair uses—which are by definition noninfringing uses, *see* 17 U.S.C. § 107—from its scope. No other court of appeals has adopted that interpretation. *See MDY Indus., LLC v. Blizzard Enter., Inc.*, 629 F.3d 928, 943-52 (9th Cir. 2010) (disagreeing with *Chamberlain*). Plaintiffs have not asked us to interpret section 1201(a) as *Chamberlain* did, so we express no opinion on that question in resolving this case.

massive scale." *Id*. at 22. Plaintiffs do not argue that any of those applications of the statute violate the First Amendment.

In addition, we have already sustained section 1201(a) against Huang's pre-enforcement First Amendment challenge as applied to his proposed sale of a device that circumvents most digital video streams' protection technology. *Green*, 54 F.4th at 746-47. That device, we observed, would "eviscerate virtually every single video content delivery protection system," exposing copyrighted video content to widespread infringement and "gutting the government's substantial interest" in promoting the dissemination of copyrighted works. *Id*. Additional examples abound.

Plaintiffs nonetheless insist there are "numerous specific categories of third-party speech impermissibly burdened by Section 1201(a)," which together "[o]vershadow" legitimate applications of the law. Appellants' Br. 45-46. They list a few activities that they cast as speech burdened by the DMCA, including: a documentary filmmaker using in her own film copyrighted video clips she obtained via circumvention; a visually impaired person enabling read-aloud functionality of an e-book by circumventing its technological protections; and a camera owner gaining access to encrypted photograph metadata via circumvention rather than by purchasing the camera manufacturer's software containing the decryption keys. Appellants' Br. 46; Reply Br. 20. Plaintiffs do not contend that those acts of circumvention are themselves expressive conduct, but claim they are nonetheless entitled to First Amendment protection. And, even as to their many examples that plaintiffs concede fall within exemptions promulgated by the Librarian of Congress, they claim the rulemaking process itself is an unconstitutional burden on its beneficiaries' speech. Appellants' Br. 46.

Plaintiffs' insistence that their examples establish unconstitutional applications of the DMCA substantially disproportionate to the statute's legitimate sweep is unpersuasive. Even assuming their putative overbreadth showing were adequate on its own terms, it rests on a series of faulty premises.

*First,* plaintiffs posit that the First Amendment protects the "right to access and learn from digital works," not just the right to make fair use of work via legitimate rights of access, and they rely on that premise to argue that statutory protection of barriers to access violates the First Amendment. Appellants' Br. 24-25. The First Amendment protects a right to read, but it does not grant unimpeded access to every reading material a reader might wish for. Similarly, the First Amendment does not guarantee potential fair users unfettered or privileged access to copyrighted works they seek to use in their own expression. To hold otherwise would defy the First Amendment's solicitude of speakers' control over their own speech. *See Harper & Row*, 471 U.S. at 559 (noting that copyright serves the First Amendment value of the "right not to speak").

If every work that the public might wish to access "could be pirated away" via circumvention, soon nothing worth reading would be published electronically. *Id*. Plaintiffs' premise that fair users are entitled to make unauthorized use of copyrighted works assumes away the very entitlements copyright law validly protects. Consumers' access to copyrighted work routinely requires consent from the copyright owner—typically obtained by paying for access subject to certain limitations on use.

Plaintiffs' argument to the contrary proves too much. On their logic, a theatre critic wishing to run a photograph with his

review would be exempted from the theater's no-photographing rule. That would be a significant extension of the First Amendment. *See generally* Gideon Parchomovsky & Kevin A. Goldman, *Fair Use Harbors*, 93 Va. L. Rev. 1483, 1522 (2007) (invoking such an example in support of conclusion that "rightsholders owe no affirmative 'duty' to make their works available for" fair use). Fair use "has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original. *Universal City Studios*, 273 F.3d at 459; *see Houchins v. KQED, Inc.*, 438 U.S. 1, 12 (1978) (holding that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information" (emphasis omitted) (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965))).

*Second*, plaintiffs alternatively assert that when an individual circumvents to obtain copyrighted work for use in her own expression, that circumvention is constitutionally protected as a "step in the creation of speech," akin to filming or newsgathering. *Price*, 45 F.4th at 1070. Even assuming that some circumvention is constitutionally privileged because necessary to constitutionally protected expression using the copyrighted work, section 1201(a)'s provisions are not automatically unconstitutional in those instances. After all, even political speech may be subject to certain regulatory constraints. *See, e.g.*, *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015); *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Identification of relevant conduct as First Amendment-protected "merely launches our inquiry." *Price*, 45 F.4th at 1067.

Plaintiffs have not made the showing needed to survive that First Amendment inquiry. They largely concede that the constitutionality of section 1201(a) as applied to their hypothetical DMCA applications is controlled by intermediate

scrutiny. *See* Appellants' Br. 49-51. They briefly suggest application of strict scrutiny—that certain applications of section 1201(a) would "interfere with third-party commentary on political debates, which is at the heart of democratic governance and thus . . . would demand (and fail) . . . strict scrutiny," *id.* at 42—but they are wrong that a content-neutral failure to facilitate political commentary triggers strict First Amendment scrutiny. Strict scrutiny applies to provisions that are facially content-based or otherwise turn on the message conveyed, which plaintiffs do not contend is the case here. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Plaintiffs briefly suggest that "certain exemptions granted to third parties under Section 1201 engage in content- and speaker-based discrimination" in distinguishing between types of speakers (they mention exemption of documentary but not narrative filmmakers). Appellants' Br. 42. But they do not base any argument for strict scrutiny on that characterization.

As alleged, none of plaintiffs' potential applications of section 1201(a) to third-party fair users would fail intermediate scrutiny. For example, at oral argument they highlighted their assertion that section 1201(a) would impermissibly burden the speech of a fifth-grade teacher who wished to circumvent a DVD's encryption and extract a clip to screen during a lesson. *See* Oral Arg. Rec. 29:01-30:02. Application of section 1201(a) to bar that circumvention would survive intermediate scrutiny so long as "it furthers an important or substantial governmental interest; . . . the governmental interest is unrelated to the suppression of free expression; and . . . the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Green*, 54 F.4th at 746 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994)).

As to the first two intermediate-scrutiny factors, section 1201(a) furthers a substantial governmental interest in fostering the widespread availability of copyrighted digital work on a content-neutral basis, and that interest would be sharply curtailed in the absence of enforceable technological protections. *Id.* As to the third factor, plaintiffs have made no plausible allegations that section 1201(a)'s protection against circumvention of digital locks somehow unnecessarily burdens the hypothetical teacher's speech. Indeed, any constitutionally cognizable burden is slight; the posited demonstration presumably could proceed if the teacher inserted his DVD into the classroom player and fast-forwarded to the relevant scene.

What is more, plaintiffs' hypothetical teacher's DVD use is currently facilitated by a regulatory exemption permitting him to circumvent for the hypothesized purpose. *See* 2021 Final Rule, 86 Fed. Reg. at 59,637/3 (codified at 37 C.F.R. § 201.40(b)(1)). Plaintiffs argue that the exemption intensifies the claimed constitutional defect by burdening the teacher, or someone else with the same interest, with periodic participation in the rulemaking process. Appellants' Br. 46. But exemptions are generally applicable—benefitting all who fall within the class, rather than only those who requested them—so as a practical matter the onus of renewing popular and longstanding exemptions may be widely shared. And consider that proof of fair use, too, entails some procedural burden; just as that alone does not render it an unconstitutional defense, the complaint before us does not allege that the burden of seeking a regulatory exemption renders the DMCA constitutionally flawed. At bottom, as already noted, plaintiffs have not adequately described any adverse effect of section 1201(a) on the educator's ability to teach his students that enables us to weigh that cost against the government's substantial interest in protecting copyrighted works.

Section 1201(a) is constitutionally applied as to a wide range of non-expressive conduct that involves circumvention and trafficking, and its application to copyrighted expression readily withstands First Amendment scrutiny. We need not rule out the prospect that section 1201(a) might be unconstitutionally applied to certain speakers to conclude that plaintiffs have not plausibly identified a single such application, let alone shown that unconstitutional applications predominate over constitutional ones. Plaintiffs' highly particularized yet underdeveloped examples simply do not add up to the "lopsided ratio" of unconstitutional applications required to sustain a facial challenge. *Hansen*, 599 U.S. at 770.

We do not purport to pass on every circumstance in which a speaker seeks to circumvent a copyrighted work's technological controls to make fair use of the work. It could be that "incidental restriction[s] on alleged First Amendment freedoms" posed by section 1201(a) are sufficiently material in some situations that its application fails intermediate scrutiny. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001-02 (D.C. Cir. 2014). And future litigants might plausibly argue that a particular regulatory exemption discriminates based on the content or viewpoint of speech and is therefore subject to strict scrutiny. But plaintiffs do not raise those arguments here.

**B.**

Recognizing that section 1201(a) might impose incidental burdens on fair users that could be alleviated without undercutting the statute's protection of copyrighted works distributed electronically, Congress delegated authority to the Librarian of Congress to craft exemptions to the anticircumvention provision. Plaintiffs urge that, in so doing, Congress enacted an unconstitutional prior restraint on speech.

Plaintiffs cast the Librarian of Congress's authority to grant exemptions to the anticircumvention provision as akin to a censor's speech-licensing power. As they see it, section 1201(a) bars fair users from circumventing technological protections unless and until they obtain a licensing body's approval of the content of their intended speech. And they claim that the Librarian of Congress's authority to grant exemptions is "unbounded," insufficiently checked by prompt judicial review, and invites content and viewpoint-based discrimination. Appellants' Br. 30-39. For support, they point to the Librarian of Congress's grant of permission in the 2015 Final Rule for university students whose course of study requires close analysis of film and media excerpts to circumvent motion pictures' technological controls in order to obtain clips for educational purposes. They argue that the exemption discriminates against students enrolled in massive open online classes by failing to include them. *Id.* at 35.

As explained above, the Librarian of Congress determines through a rulemaking proceeding whether and how the anticircumvention provision has, or is likely to have, an adverse effect on people's ability to make noninfringing uses of classes of copyrighted works. 17 U.S.C. § 1201(a)(1)(C). The Librarian must consider existing and proposed exemptions for such users every three years. To make exemption determinations, the Librarian must consider: (1) "the availability for use of copyrighted works," (2) "the availability for use of works for nonprofit archival, preservation, and educational purposes," (3) "the impact that [the anticircumvention provision] has on criticism, comment, news reporting, teaching, scholarship, or research," (4) "the effect of circumvention of technological measures on the market for or value of copyrighted works," and (5) "such other factors as the Librarian considers appropriate." *Id.* § 1201(a)(1)(C)(i)-(v).

It is generally fair to say that what the fair use defense does for copyright infringement, the exemptions do for section 1201(a). In the context of copyright infringement liability, the fair use defense avoids "rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Andy Warhol Found.,* 598 U.S. at 527 (quoting *Stewart*, 495 U.S. at 236). Similarly, Congress in section 1201(a) enacted some permanent exemptions and a dynamic regulatory exemption scheme to blunt the anticircumvention provision's incidental burdens on noninfringing—*i.e.,* fair—uses. The parallel is highlighted by the way the statutory standard for triennial rulemaking borrows liberally from the doctrine of fair use. Indeed, the Librarian's final rules resemble a series of *ex ante* determinations as to which activities are likely to qualify as fair uses that would be adversely affected by the anticircumvention provision if not exempted.

Plaintiffs' facial challenge to the Librarian's exemption authority requires us to determine, at the threshold, whether the DMCA's regulatory exemption scheme is an *ex ante* speech-licensing regime, which would "bear[] a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). Only licensing laws with "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship are "vulnerable to facial challenges." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). If the law is a prior restraint, and thus amenable to a facial challenge, we must determine whether it "condition[s] expression on a licensing body's prior approval of content." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002). If it does, the law is subject to strict procedural requirements, including prompt judicial review in which the

burden of going to and prevailing in court to suppress the speech rests on the censor. *Id.* Content neutral preconditions, in contrast, need not satisfy those procedural requirements and will survive a facial prior-restraint challenge so long as they "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010) (quoting *Thomas*, 534 U.S. at 323).

Plaintiffs' speech-licensing claim fails at the threshold. The DMCA's authorization of regulatory exemptions does not operate as a prior restraint on speech. Is it therefore not susceptible to a facial First Amendment challenge.

Again, not all government licensing schemes are subject to the "extraordinary doctrine" permitting facial First Amendment challenges. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (quoting *City of Lakewood*, 486 U.S. at 772 (White, J., dissenting)). We entertain a facial speech-licensing challenge only when a statute "ha[s] a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of either of two "identified censorship risks." *City of Lakewood*, 486 U.S. at 759. Those risks are twofold: The first is the chill that results when speakers respond to unclear licensing standards by attempting to conform their speech to the censor's perceived preferences. A second hazard of legal preconditions on expression is that, "without standards to fetter the licensor's discretion," they invite content or viewpoint discrimination. *Id*. at 758-59. Speakers relegated to as-applied challenges against illegitimate enforcement may capitulate rather than litigate or, if they sue, "the eventual relief may be 'too little and too late'" to effectively remedy opportunities for speech lost while litigation is pending. *Id.* at 758.

Generally applicable laws that are not aimed at expression or conduct commonly associated with expression do not pose those censorship dangers. In *City of Lakewood*, the Supreme Court explained that a law requiring building permits and an ordinance requiring soda vendors to obtain permits to place machines on public property are not vulnerable to speech-licensing challenges "prior to an allegation of actual misuse." *Id.* at 761. The Court recognized those laws could be abused to censor, "such as when an unpopular newspaper seeks to build a new plant," but held they are "too blunt a censorship instrument" to be facially subject to the prior restraint doctrine's exacting review. *Id.* Licensing schemes that are not "most likely to be in fact an instrument of censorship" are better addressed through as-applied challenges. *The Tool Box v. Ogden City Corp.*, 355 F.3d 1236, 1242 (10th Cir. 2004) (en banc).

The DMCA's regulatory exemption process is not a speech-licensing scheme. The law neither directly regulates speech nor bears a "close enough nexus to expression, or to conduct commonly associated with expression," to threaten the sort of censorship risks against which the prior restraint doctrine guards. *City of Lakewood*, 486 U.S. at 759.

To begin, section 1201(a) has little in common with paradigmatic prior restraints, which require prior governmental approval before a person may lawfully speak. In *Near v. Minnesota ex rel. Olson*, the foundational prior-restraint case, the Supreme Court struck down a state law authorizing the government to act in advance to "abate[]" the publication of any "malicious, scandalous and defamatory newspaper, magazine or other periodical." 283 U.S. 697, 701-02 (1931). Other classically unconstitutional prior restraints have "requir[ed] a permit and a fee before authorizing public speaking, parades, or assemblies" on a town's public property,

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992), or required a government board's prior approval of theatrical productions proposed to be staged at a town's theater, *Se. Promotions, Inc.*, 420 U.S. at 548. In contrast, as discussed, the anticircumvention provision regulates conduct—the act of circumventing technological locks—not expression.

Section 1201(a) also lacks a sufficiently "close . . . nexus to . . . conduct commonly associated with expression" to bring it within the scope of the prior restraint doctrine. *City of Lakewood*, 486 U.S. at 759. Plaintiffs cast section 1201(a) as a speech-licensing regime because the anticircumvention provision applies to some individuals who circumvent technological locks "in order to facilitate their own subsequent expression," such as the *Fioranelli* filmmaker. Reply Br. 4. Plaintiffs thus again analogize circumvention to the act of taking photographs or making audio or video recordings—non-communicative activities that, as "step[s] in the creation of speech," may be "protected as speech under the First Amendment." *Price*, 45 F.4th at 1070.

But that argument fails because circumventing copyright works' technological protections has no necessary or ordinary function as a facilitator of speech. To the contrary, plaintiffs do not even allege that section 1201(a) "largely targets" speech. *Cf. FW/PBS, Inc.*, 493 U.S. at 224. And for good reason. As we have explained, the act of circumventing technological protection measures often has no connection to speech at all. Even many fair or noninfringing uses for which the Librarian of Congress has authorized circumvention do not qualify as expressive. For example, consider the Librarian of Congress's circumvention exemption for the repair of software-enabled devices. The exemption allows owners of those devices—ranging from MRI machines to smart alarm clocks to vehicles—to circumvent technological protections on

copyrighted software in order to conduct their own repairs and maintenance on their devices. *See* 86 Fed. Reg. at 59,640/1 (codified at 37 C.F.R. § 201.40(b)(15)). The repair of consumer or medical devices is not expressive conduct.

Compare the scope of section 1201(a) with the ordinance at issue in *City of Lakewood* to which plaintiffs analogize the DMCA's exemption regime. That local ordinance required newspapers to apply annually for mayoral permission to place news racks on city sidewalks. 486 U.S. at 753. The Court concluded that the distribution of newspapers was "conduct commonly associated with expression" and its regulation therefore subject to facial challenge. *Id.* at 760. But using news racks to distribute newspapers, unlike circumvention of technological locks, has a necessary correlation with expression: *All* newspaper racks distribute speech. They are, in effect, mechanical pamphleteers. *Id.* at 761-62.

The DMCA's anticircumvention provision is more akin to a routine prohibition on trespass, which is not conduct closely associated with expression. *See* S. Rep. 105-190, at 11 (comparing circumvention to "break[ing] into a house"). A trespass law undoubtedly affects some expressive conduct, as when political protestors trespass to stage a demonstration where it might have maximal impact. Similarly, the DMCA's anticircumvention provision might preclude a student from circumventing technological measures to cut a high-quality clip of a copyrighted feature film to use in his class presentation. But trespassing is not "necessarily associated with speech," because laws prohibiting trespass also "apply to strollers, loiterers, drug dealers, roller skaters, bird watchers, soccer players, and others not engaged in constitutionally protected conduct." *Hicks*, 539 U.S. at 123-24; *see also Thomas*, 534 U.S. at 322 (upholding an ordinance requiring a permit for large-scale events, noting that, "unlike the classic

censorship scheme," it was "not even directed to communicative activity as such, but rather to *all* activity conducted in a public park"). The same is true of the anticircumvention provision—a law that applies equally to would-be speakers, repair technicians, and music or movie pirates.

The Fifth Circuit's decision in *Moore v. Brown*, 868 F.3d 398 (5th Cir. 2017) (per curiam), aptly illustrates the point. There, an evangelical Christian regularly set up a large sketch board in a public park in Dallas seeking to spread his message by engaging passersby in conversation about his religion. *Id.* at 401. He received a "criminal trespass warning" for violating the city's structure rule, which required a permit to erect in the park any structures in excess of a certain size. *Id.* The structure rule was not an unconstitutional speech-licensing law because it "lack[ed] a close nexus to expression." *Id.* at 405. Instead, it simply reflected the city's interests in keeping the small park with its high pedestrian traffic free of all sorts of large structures, including tents and tables as well as signs and sketch boards. The practical burden the regulation posed for Mr. Moore's speech (and presumably that of many other would-be speakers in varied circumstances) was not sufficient to subject the law to facial challenge as a speech-licensing provision. *Id.*

Finally, we note that plaintiffs nowhere contend that the challenged DMCA provisions prevent would-be fair users from conveying their chosen messages. To the contrary, those speakers often have alternative ways to obtain lawful access to the copyrighted work for their fair use. A filmmaker who wants to use a clip of a copyrighted news segment, for example, could seek a license from the copyright owner, record the segment with screen-capture technology, reenact it with actors, or communicate the newsworthy event in a different way. A teacher or student who wants to display a clip of a movie in his

class presentation could purchase the movie on a DVD and play the relevant segment on his classroom's player. Plaintiffs themselves tellingly frame the stakes of their challenge as "who gets to *make high quality copies* for fair use in their own speech"—not who gets to speak, or what they may say. Oral Arg. Rec. 0:25-0:43 (emphasis added).

Constitutional disapproval of prior restraints is a mismatch for the DMCA's authorization of regulatory exemptions. A doctrine fashioned to prevent public officials from preemptively silencing messages or speakers finds no purchase where no message is disfavored and ample avenues of expression remain open.

In *Ward v. Rock Against Racism*, for example, the Supreme Court upheld a New York City noise control regulation of concerts at a Central Park bandshell. 491 U.S. at 784. To avoid having to shut down concerts once they became too loud, as it had done in the past, the city required all performances to use city-provided sound equipment and technicians. *Id.* at 784-88. The majority rejected the charge that the law was a "quintessential prior restraint," *id.* at 808 (Marshall, J., dissenting), stressing that it "grant[ed] no authority to forbid speech, but merely permit[ted] the city to regulate volume to the extent necessary to avoid excessive noise," *id.* at 795 n.5 (majority op.). Applying the same logic, the Supreme Court declined to analyze as a prior restraint an injunction imposing a buffer zone around an abortion clinic, noting that the protestors were "not prevented from expressing their message in any one of several different ways." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 n.2 (1994); *see also Hill v. Colorado*, 530 U.S. 703, 734 (2000) (rejecting prior restraint challenge where "absolutely no channel of communication is foreclosed. No speaker is silenced. And no message is prohibited."). The same holds true of section

1201(a), which might incidentally burden certain means of expression, but neither targets expression nor in fact prevents speakers from conveying their messages.

Our holding does not insulate the Librarian's exemption determinations from judicial review. As-applied challenges remain available to plaintiffs who plausibly allege that the Librarian made a content- or viewpoint-based exemption determination. *See Boardley*, 615 F.3d at 517 (noting that "a future as-applied challenge could argue" that a denial of a permit was "pretext for content-based discrimination"). But plaintiffs' facial challenge fails because section 1201(a) is not a speech licensing law.

* * *

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*